**FILED**

Mar 26 2018, 9:03 am

**CLERK**
Indiana Supreme Court
Court of Appeals
and Tax Court



| | |
|---|---|
| ATTORNEY FOR APPELLANT | ATTORNEYS FOR APPELLEE |
| Kenneth J. Falk | Michelle Cooper |
| ACLU of Indiana | Sara R. Blevins |
| Indianapolis, Indiana | Lewis & Kappes, P.C. |
| | Indianapolis, Indiana |

# I N  T H E
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| S.B., | March 26, 2018 |
| *Appellant-Respondent,* | Court of Appeals Case No. 36A01-1710-PO-2252 |
| v. | Appeal from the Jackson Superior Court |
| Seymour Community Schools, | The Honorable Chris D. Monroe, Senior Judge |
| *Appellee-Petitioner.* | Trial Court Cause No. 36D02-1708-PO-141 |

**Najam, Judge.**

# Statement of the Case

S.B. appeals the trial court's issuance of an order for protection on behalf of Seymour Community Schools ("SCS").[1] S.B. raises four issues for our review, which we restate as the following three issues:

1. Whether SCS has standing to petition for an order for protection.

2. Whether the trial court's issuance of the order for protection was clearly erroneous.

3. Whether the order for protection violates S.B.'s rights under the First Amendment or the Second Amendment to the United States Constitution.

We affirm and remand with instructions.

# Facts and Procedural History

In the summer of 2015, a teacher at the Seymour Middle School molested S.B.'s daughter.[2] As a result of that molestation, S.B.'s daughter has needed extensive therapy, and she is suicidal. However, her family can no longer

---

[1] A petitioner for an order for protection is usually entitled to confidentiality, *see* Ind. Code § 5-2-9-7 (2017), but SCS has not objected to the display of its name in public records relating to this matter. Accordingly, SCS has waived any right to confidentiality it may have had in its identity on appeal. *See* Ind. Administrative Rule 9(G)(6).

[2] That teacher subsequently pleaded guilty to three counts of Level 4 felony child molesting and received an aggregate executed term of twenty-one years, which sentence we affirmed on appeal. *Murray v. State*, 74 N.E.3d 242, 246 (Ind. Ct. App. 2017).

afford her medical bills. S.B. has sought compensation from SCS "because of the damage [done] by their employee," to no avail.[3] Tr. at 38.

[4] On August 9, 2017, the first day of the new school year, S.B. stood on a public sidewalk immediately adjacent to the grounds of the Seymour Middle School. S.B. held a sign that read, in red capital letters against a white background, "WE PROTECT PEDOPHILES." Ex. Vol. at 4.[4] S.B.'s sign was attached to the end of a long-handled shovel, with the shovel end against the pavement. S.B., who has a license to carry, had a handgun holstered on his right hip.

[5] The day before his protest, S.B. called the Seymour Police Department and informed officers that he would be "present at the Middle School" on the "public sidewalk" and that he "might have a weapon." Tr. at 5. As such, multiple police officers were at the school during S.B.'s protest. One officer, Seymour Police Department Officer Chadd Rogers, stood near S.B. throughout his protest. Officer Rogers testified that he had positioned himself near S.B. because Rogers thought parents "would feel more comfortable if I was standing next to him" in light of S.B.'s visible firearm. *Id.* at 43. As parents dropped their children off at the school, "a number" of them asked school officials why S.B. was standing on the sidewalk, and at least "one father was very upset that . . . the first thing [his] child saw . . . [on the] first day of school was [a] man standing outside the school with [a] gun." *Id.* at 30.

---

[3] S.B. has filed a tort claim notice against SCS but, as of yet, not a lawsuit.

[4] Our pagination of the Exhibits Volume is based on the .pdf pagination.

SCS Superintendent Robert Hooker approached S.B., who "greeted [Hooker] . . . pleasantly." *Id.* at 8. Hooker asked S.B., "what is this about?" *Id.* S.B. said "this was about . . . his daughter and [the] former teacher." *Id.* Hooker then asked S.B. if S.B. would "put his weapon in []his car" because Hooker "was concerned about a weapon that close to school children . . . ." *Id.*

Hooker considered the proximity of the weapon to be "a major threat . . . given the nature of . . . school violence." *Id.* As Hooker later explained:

> when there is [a] weapon anywhere near [a] school we lock down[. B]ehind us is Cummins and [it] wasn't that long ago an employee shot his supervisor . . . [, and] whenever a bank . . . is robbed . . . the police department does an excellent job informing us, and we tend to lock down . . . whether . . . we even know if there's a weapon[] or not[. W]e react defensively rather quickly to any weapons possib[ly] anywhere near school children.

*Id.* at 10.

S.B. declined to remove his firearm as requested. Instead, he asked how Hooker would feel if S.B. "brought . . . [his] AK-47," and S.B. then said that "he would be back at 2:45" that afternoon "at the High School." *Id.* at 9-10. Hooker interpreted those comments to be "a threat." *Id.* at 16. S.B. further "alluded to . . . another weapon, [a] gun in his pocket, but he didn't show" that weapon. *Id.* at 11. During their conversation, Hooker observed that S.B. "started out reasonable[ and] pleasant" but became "obviously upset," "distressed," and "ang[ry]." *Id.* at 9-10.

[9]     On behalf of SCS, Hooker petitioned the trial court for an order for protection based on an alleged "threat of violence." Appellant's App. Vol. II at 12. Specifically, SCS alleged that S.B. had threatened physical harm and placed others in fear of physical harm. *Id.* at 13. In an attached memorandum, SCS stated that it sought the order for protection on behalf of "its students," among others. *Id.* at 20. The court entered a temporary *ex parte* order for protection that same day, and S.B. was served with that order. Thereafter, the court held a fact-finding hearing on whether to extend the temporary order. S.B. attended that hearing *pro se*, and SCS attended by counsel.

[10]    Following that hearing, the court entered a two-year order for protection on behalf of SCS. In the order, the court found that "stalking has occurred," that S.B. "represents a credible threat to the safety of the Petitioner," and that the order for protection was necessary "to bring about a cessation of the violence or the threat of violence." Appellant's App. Vol. II at 8.

[11]    In light of those findings, the court, using a form document, concluded that "[S.B.] is hereby enjoined from threatening to commit or committing acts of . . . stalking" against SCS and "from harassing, annoying, telephoning, contacting, or directly or indirectly communicating with" SCS. *Id.* The court further ordered S.B. "to stay away from the residence, school[,] and place of employment" of SCS. *Id.* Specifically, the court directed S.B. "to stay away from" the SCS Administrative Office, the Seymour High School, the Seymour Middle School, the Seymour Sixth Grade Center, five SCS elementary schools, and an SCS athletic complex. *Id.* at 8-9. However, the court did not restrict

S.B.'s ownership of or access to firearms; instead, in its order the court expressly found that S.B. is not "Brady disqualified."[5]  *Id.* at 7-9.  This appeal ensued.

## Discussion and Decision

### *Issue One:  Standing*

[12]  On appeal, S.B. first asserts that SCS is not a "biological person" and, as such, the Indiana Civil Protection Order Act ("the Act") does not permit SCS to petition for an order for protection.  Appellant's Br. at 19-21.  We initially note that S.B. did not object in the trial court to SCS's purported lack of standing.  As such, we briefly consider whether S.B. may raise this issue for the first time on appeal.

[13]  Where, as here, a party on appeal challenges the other party's standing but has not made that argument to the trial court, the precise basis for the challenge is significant.  The judicial doctrine of standing may, on the one hand, concern whether a party has shown "adequate injury or the immediate danger of sustaining some injury."  *Pence v. State*, 652 N.E.2d 486, 488 (Ind. 1995).  However, it may also concern "whether the complaining party is the proper party to invoke the court's power."  *Schloss v. City of Indianapolis*, 553 N.E.2d 1204, 1206 (Ind. 1990).

---

[5]  To be "Brady disqualified" means that a person is prohibited under the federal Brady Handgun Violence Prevention Act of 1993 from possessing or purchasing a firearm.  *See* 18 U.S.C.A. §§ 921-22 (West 2006).

[14]     If the challenge is based on the adequacy of the other party's injury, "the issue of standing may be waived" when it is not properly preserved in the trial court. *E.g.*, *Kelley v. State*, 11 N.E.3d 973, 977 (Ind. Ct. App. 2014) (citing, *inter alia*, *Burcham v. Metro. Bd. of Zoning App.*, 883 N.E.2d 204, 210-12 (Ind. Ct. App. 2008)). However, where the challenge goes to whether the other party was the proper party to invoke the power of the judiciary in the first instance, the challenge asserts, in effect, that the trial court's judgment cannot be cured and is void. *E.g.*, *J.C. v. J.B. (In re A.J.A.)*, 991 N.E.2d 110, 113-15 (Ind. 2013). Such challenges may be raised collaterally, which includes being raised for the first time on appeal. *Id.* As S.B.'s challenge to SCS's standing falls within this latter category, we consider his challenge on its merits.

[15]     On the merits, S.B. asserts that SCS lacks standing to petition for an order for protection because the Act states that such petitions must be filed by "[a] person" or by "[a] parent, a guardian, or another representative . . . on behalf of a child." Ind. Code § 34-26-5-2(a), (b) (2017). The Act further states that such a petition must be filed against either a "family or household member who commits an act of domestic or family violence" or against a "person who has committed stalking . . . or a sex offense" against the petitioner or the child. I.C. § 34-26-5-2(a), (b). And the Act provides that its provisions "shall be construed to promote the: (1) protection and safety of all victims of domestic or family violence in a fair, prompt, and effective manner; and (2) prevention of future domestic and family violence." I.C. § 34-26-5-1. According to S.B., that language demonstrates a clear legislative intent to limit who may petition for an

order for protection to a "biological person." Appellant's Br. at 20. We reject S.B.'s argument for three reasons.

[16] First, the Act expressly provides that "another representative" may petition for an order for protection on behalf of a child. I.C. § 34-26-5-2(b). "Representative" here means a "spouse, parent, guardian, trustee, attorney, or other legal agent." *C.H. v. A.R.*, 72 N.E.3d 996, 1002 (Ind. Ct. App. 2017) (quoting I.C. §§ 34-6-2-130, -18-2-25). "The law is well settled in this state that the teacher," and by extension the teacher's employer, "stands *in loco parentis* to the child" and, as such, has "the same right over a child in his or her school as is possessed by the parent." *Ft. Wayne Cmty. Schs. v. Haney*, ___ N.E.3d ___, No. 02A03-1708-CT-1829, 2018 WL 700810, at *4 (Ind. Ct. App. 2018) (quoting *Ind. State Pers. Bd. v. Jackson*, 244 Ind. 321, 192 N.E.2d 740, 743-44 (1963)), *not yet certified*; *see also* I.C. § 20-33-8-8. Accordingly, we conclude that one who stands *in loco parentis* to a child is "another representative" who may petition for an order for protection on behalf of that child under Indiana Code Section 34-26-5-2.

[17] SCS stands *in loco parentis* to the children within its schools while they are there. Indeed, its petition expressly declared that it sought the order for protection on behalf of its students. As such, SCS had standing to petition for the order for protection of behalf of those children.

[18] Second, "person" is not specially defined within the Act. Accordingly, we look to Indiana Code Chapter 1-1-4, which provides generally applicable statutory

definitions. In particular, Indiana Code Section 1-1-4-5(a)(17) states that "'[p]erson' extends to bodies politic and corporate." Thus, under the generally applicable statutory definition of "person," the Act applies to SCS. Had the General Assembly sought a different definition special to the Act, it would have provided for that definition within the Act itself. *See, e.g.*, *State v. Prater*, 922 N.E.2d 746, 750 (Ind. Ct. App. 2010) ("In interpreting a statute, we must consider not only what the statute says but what it does not say.") (quotation marks and alteration omitted), *trans. denied*.

[19] Third, extending "person" under the Act to SCS is not "plainly repugnant to the intent of the [G]eneral [A]ssembly." I.C. § 1-1-4-5(a). Stalking, one of the bases on which a petition for an order for protection may be sought, occurs when one engages in "a knowing or an intentional course of conduct involving repeated or continuing harassment of another *person* that would cause a reasonable person to feel terrorized, frightened, intimidated, or threatened and that actually causes the victim to feel terrorized, frightened, intimidated, or threatened." I.C. § 35-45-10-1 (emphasis added). As relevant to that statute, our criminal code provisions, like Indiana Code Section 1-1-4-5, define "person" as "a human being, corporation, limited liability company, partnership, unincorporated association, or governmental entity." I.C. § 35-31.5-2-234(a).

[20] We conclude that that definition is *in pari materia* with the Act. *See, e.g.*, *Clippinger v. State*, 54 N.E.3d 986, 989 (Ind. 2016). While an order for protection is a civil order, such orders are surrounded by criminal provisions.

On the front end, the petitioner must establish an act of domestic or family violence, stalking, or a sex offense as a predicate for the issuance of the order. I.C. § 34-26-5-2(a), (b). And, on the back end, a violation of an order for protection is a criminal offense of invasion of privacy. I.C. § 35-46-1-15.1(a)(1). Thus, the Act is intertwined with our criminal statutes, and we will interpret them harmoniously.

[21] Moreover, our conclusion is precisely within our legislature's intent. Our legislature has recognized that school safety is a priority. For example, Indiana Code Section 20-19-3-14 establishes a Division of School Building Physical Security and Safety as part of the Indiana Department of Education. Indiana Code Section 5-2-10.1-9 requires each school corporation to designate a school safety specialist, whose responsibilities include the development and coordination of safety plans. And Indiana Code Section 35-47-9-2(a) generally provides that a person who knowingly or intentionally possesses a firearm on school property commits a Level 6 felony.

[22] As the recent tragic events in Parkland, Florida, have reminded us, some persons who might present a threat to a school have had a relationship with the school that school officials are in a unique position to identify. This would most often include students or former students who have a disciplinary history or have exhibited significant behavioral issues. We conclude that school corporations, through their officials, are permitted to act on behalf of their students to seek orders for protection against such threats. Accordingly, we

reject S.B.'s argument that SCS lacked standing to petition for an order for protection.

### *Issue Two:  Whether the Order is Clearly Erroneous*

[23]    We thus turn to S.B.'s argument on appeal that the order for protection is clearly erroneous.  In particular, S.B. asserts that the trial court based the order for protection on a single act—his protest in front of the middle school—and a single act does not constitute "stalking."  S.B. further contends that the trial court's finding that a threat occurred is not supported by the evidence.

[24]    As we have explained, orders for protection

> are similar to injunctions, and therefore in granting an order the trial court must *sua sponte* make special findings of fact and conclusions thereon.  *Hanauer v. Hanauer*, 981 N.E.2d 147, 148 (Ind. Ct. App. 2013) (citing, *inter alia*, Ind. Trial Rule 52(A) and Ind. Code § 34-26-5-9(a), (f)).  We apply a two-tiered standard of review:  we first determine whether the evidence supports the findings, and then we determine whether the findings support the order.  *Id.* at 149.  In deference to the trial court's proximity to the issues, we disturb the order only where there is no evidence supporting the findings or the findings fail to support the order.  *Koch Dev. Corp. v. Koch*, 996 N.E.2d 358, 369 (Ind. Ct. App. 2013), *trans. denied* (2014).  We do not reweigh evidence or reassess witness credibility, and we consider only the evidence favorable to the trial court's order.  *Id.*  The party appealing the order must establish that the findings are clearly erroneous.  *Id.* "Findings are clearly erroneous when a review of the record leaves us firmly convinced that a mistake has been made.  We do not defer to conclusions of law, however, and evaluate them *de novo*."  *Mysliwy v. Mysliwy*, 953 N.E.2d 1072, 1076 (Ind. Ct. App. 2011) (citation omitted), *trans. denied*.

*Fox v. Bonam*, 45 N.E.3d 794, 798-99 (Ind. Ct. App. 2015).

[25] As relevant here, "stalking" requires "repeated or continuing harassment" that would cause a reasonable person to feel threatened and that actually caused a person to feel threatened. I.C. § 35-45-10-1. Without question, "the term 'repeated' in Indiana's anti-stalking law means 'more than once.'" *Johnson v. State*, 721 N.E.2d 327, 332-33 (Ind. Ct. App. 1999), *trans. denied*. However, our case law has not yet defined the separate basis for stalking, namely, when the course of conduct is "continuing." "Continuing" is commonly defined as "[u]ninterrupted; persisting." Black's Law Dictionary 388 (10th ed. 2014). We also accept the definition proffered by S.B. in his Reply Brief that "continuing" requires "not just current[] but future activity." Reply Br. at 18-19 (collecting authority). And, again, the Act shall be construed to promote the prevention of violence on which a petition is based. *See* I.C. § 34-26-5-1.

[26] The evidence most favorable to the trial court's judgment supports its finding that S.B. had committed stalking by engaging in a course of conduct that involved continuing harassment. S.B. appeared at the Seymour Middle School with a visible firearm. A number of parents who had arrived to drop off their children for the first day of school were concerned about S.B., and at least one parent was demonstrably upset about S.B. having a visible firearm so near the school. When Hooker asked S.B. to place the firearm in S.B.'s vehicle, S.B. refused, and S.B. then became "obviously upset," "distressed," and "ang[ry]." Tr. at 9-10. Rather than remove his firearm, S.B. instead alluded to a concealed weapon on his person, and he further suggested that he would go to the

Seymour High School later that same day with an AK-47. Those facts support the trial court's finding that S.B. was engaged in a course of conduct involving continuing harassment.

[27] S.B. also asserts that "there is not a scintilla of evidence that Mr. Hooker or anyone from the school system felt threatened or in fear in any way." Appellant's Br. at 25. But S.B. disregards Hooker's testimony that he had interpreted S.B.'s comments to be a "threat." Tr. at 16. Further, again, at least one parent was demonstrably upset that S.B. was carrying a firearm so near the school, and an obvious and reasonable inference from that evidence is that the parent feared for his child's safety. Indeed, it is well established that "the mere sight of a gun is sufficient to provoke a fearful response from the average citizen." *State v. Gibbs*, 769 N.E.2d 594, 598 (Ind. Ct. App. 2002), *trans. denied*. This is all the more true in the school environment, and the Supreme Court of the United States has made clear that the Second Amendment does not "cast doubt on . . . laws forbidding the carrying of firearms in sensitive places such as schools . . . ." *District of Columbia v. Heller*, 554 U.S. 570, 626 (2008).

[28] The evidence before the trial court sufficiently demonstrates both a current threat and a future threat. S.B.'s arguments to the contrary emphasize his own interpretation of the facts that he was merely engaged in a peaceful protest, but on review we are obliged to accept the facts most favorable to the trial court's judgment, and we will not reweigh the evidence. We cannot say that the trial court's issuance of the order for protection is clearly erroneous.

### *Issue Three: S.B.'s First and Second Amendment Rights*

[29] Finally, S.B. asserts that the order for protection is clearly erroneous because the order is based solely on protected First and Second Amendment activities. Constitutionally protected activities cannot be deemed to be stalking or harassment. I.C. §§ 35-45-10-1, -2. But, as explained above, considering only the facts most favorable to the trial court's judgment, we must conclude that the order for protection is based on S.B.'s continuing harassment and threats, which are not constitutionally protected activities. *E.g.*, *Brewington v. State*, 7 N.E.3d 946, 953 (Ind. 2014). And insofar as S.B.'s argument is that restrictions on his movement are equivalent to restrictions on his expressive activity, we reject it. Such an argument would make every order for protection invalid.

[30] In any event, much of S.B.'s argument here is based not on the actual language of the order for protection but, rather, on commentary by the trial court during the evidentiary hearing criticizing S.B.'s sign and suggesting that he would no longer be allowed to carry firearms. But the court itself recognized that the language of the written order, not its oral commentary, would define the order for protection. Tr. at 62. We agree and conclude that the trial court's oral commentary is not part of the order for protection. The order does not expressly prohibit S.B.'s right to protest near school property unarmed. It further says that he is not Brady disqualified.

[31] Accordingly, the order for protection does not infringe upon S.B.'s First Amendment expressive rights or his Second Amendment right to bear arms. Notably, SCS does not contest S.B.'s general right to bear arms under the

Second Amendment. However, we emphasize that, even where there are no grounds for the issuance of an order for protection, a school may prohibit the possession of firearms on school premises without violating the Second Amendment. *Heller*, 554 U.S. at 626.

[32] S.B. does not challenge the order for protection on the grounds that its command for him "to stay away from" SCS's properties is impermissibly vague. Appellant's App. Vol. II at 8-9. As such, we do not consider that possible argument. We do note, however, that SCS represented to the trial court during the evidentiary hearing that it was "okay with [S.B] dropping [his daughter] off [on school property]" and picking her up from school, so long as he "leav[es] immediately," because SCS "want[s] her to go to school." Tr. at 59-60. SCS further represented to the trial court that its "issue was and will be the guns . . . , not the sign or the protest." *Id.* at 53.

[33] Given the criminal ramifications of the violation of an order for protection, and given that an arresting officer will be unfamiliar with the transcript of the evidentiary hearing on the order for protection, we think SCS's statement in court that S.B. should be allowed to drop off and pick up his daughter at school should have been included in the order itself. Accordingly, we remand with instructions for the trial court to modify the order for protection to state that S.B. is permitted briefly, and without delay, to enter onto SCS property while unarmed for the exclusive and limited purpose of dropping his daughter off for school and picking her up from school. The court shall also modify the order to state that it does not prohibit S.B. from exercising his First Amendment right to

protest near school property while unarmed.  We further instruct the trial court to correct the caption on the order for protection to properly identify SCS as the petitioner.[6]

### *Conclusion*

[34]  In sum, we hold that a school corporation has standing to petition for an order for protection on behalf of its students.  We further hold that the trial court's issuance of the order for protection on these facts is not clearly erroneous, and, thus, we affirm the order for protection.  Although we affirm the court's order, we remand with instructions for the court to modify the order for protection as explained above.

[35]  Affirmed and remanded with instructions.

Mathias, J., and Barnes, J., concur.

---

[6] The order for protection is on a form document and contains numerous, conspicuous clerical errors.  Aside from the erroneous caption, the order is also mistitled as an *ex parte* order, and it contains several references to "the Petitioner's household."  Appellant's App. Vol. II at 8.